UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



Plaintiffs
FILIPPO TOSCANO
30 Bradley Road
North Weymouth, MA 02191

Defendants
Fleet Boston Financial
1 Federal Street., Made 10306p
Boston, MA 02110

North Weymouth 2-11-2005

04-12474 DPW

Civil Action No. 04-12474-DPW

**COMPLAINT**

I have filed my first complaint on 11-22-2004. I am still total disabled and cannot go back to work. It is permanent according to my doctors. I received a seven page letter dated January 20, 2005 from Liberty Mutual disability carrier which is Fleet Boston Financial disability carrier where they distorted and manipulated statements written by my doctors and have **stopped Long Term Disability Benefits** (see attached). . In addition to this Bank of America, formerly Fleet Boston Financial sent to me a letter dated January 25, 2005 stating that ( **Bank of America has been notified by Liberty Mutual that your long-term disability benefits have ended on January 20, 2005. Therefore, your employment with the company will end on January 20, 2005.**) (see attached ).
As you can see, Fleet Boston Financial with Liberty Mutual have taking matters in their own hands forgetting the rules under the **American Disability Act.**
I am asking this Court to take action on my behalf and help me before my health worsens. I am physically stressed and disabled to do any work at the present time and in future. In addition they have created an economical and despicable burden on me trying to annihilate me.
Fleet Boston Financial and Liberty Mutual have abused of their power against me and I feel that this is pure harassment and discrimination against a person with disability.
   I am requesting help from the high court. According to my doctors the stress I am under is too much for my heart.
   Attached you find new medical records to be added to the previous ones. These records will reiterate to the court that I am permanently disabled.
I am asking this **HONOURABLE UNITED STATES DISTRICT COURT** that justice should be rendered to me by reinstating my Long Term Disability, my Employment and and all damages caused by Fleet Boston Financial and Liberty Mutual.
Please help me, I am a honest man and a man with integrity.
Thank you very munch.


FILIPPO TOSCANO

# Bank of America

Bank of America
Personnel Service Delivery –RI1-102-12-02
111 Westminster Street
Providence, RI 02903

January 25, 2005

Filippo Toscano
30 Bradley Road
No. Weymouth, MA 02191

Dear Mr. Toscano:

Bank of America has been notified by Liberty Mutual that your long-term disability benefits have ended on January 20, 2005. Therefore, your employment with the Company will end on January 20, 2005.

While receiving benefits under the LTD Plan you were eligible to continue your group medical, dental, and personal accident coverage at the prevailing employee group rates if applicable. Fleet continued to provide, at no cost to you, Basic Life insurance coverage.

As your benefits have terminated under the LTD plan, your rights to continued group medical and dental coverage will be based on the usual COBRA rules. Information on benefit continuation through COBRA will be mailed to you under separate cover if you are currently insured in Fleet medical or dental plans.

Your Basic Life and personal accident insurance, if any, will terminate with your employment, subject to any conversion privileges available. To arrange conversion for basic life insurance or personal accident you must contact the Personnel Service Center at 888.737.7661 for a conversion application. The completed application and required premium must be received by the insurance company within 31 days after your coverage ends.

In the event your LTD claim is re-opened and approved you must contact the Personnel Service Center in order to reinstate your leave status and your active employee benefits, if appropriate.

If you believe you may be eligible for a retirement benefit, contact the Personnel Service Center at 888.737.7661. Generally, an employee is retirement eligible when his or her employment ends if, as of the date of termination of employment, he or she is at least age 55 with 10 years of service, or at least age 65 with 5 years of service. Your individual eligibility may vary.

If you have any questions please contact me at (401) 278-3311

Sincerely,

Pat Wright
Pat Wright
Personnel Service Delivery


Official Sponsor

**Liberty Mutual**

Liberty Life Assurance Company
of Boston

Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No: (800) 210-0268
Fax No: (603) 743-6122

January 20, 2005

Flippo Toscano
30 Bradley Road
N. Weymouth, MA 02191

RE:   Long Term Disability Benefits
      FleetBoston Financial Corp
      Claim #744036

Dear Mr. Toscano

We are writing in regard to your claim for disability benefits. We have completed a thorough review of your continued eligibility for disability benefits, and have determined that benefits are no longer payable. The FleetBoston Financial Corp Long Term Disability policy requires that to receive benefits beyond 24 months, or October 20, 2004, you must meet the following definition of disability.

**"Disability" or "Disabled"** *means:*

   i.   *If the Covered Person is eligible for the 24 Month Own Occupation Benefit,* **"Disability"** *or* **"Disabled"** *means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and*

   ii.  *After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.*

In order to evaluate whether or not you met the above change in the definition of disability, we requested medical information from your physician(s).

You indicate you have a physical condition of angina and neuropathy and the medical documentation dated May 18, 2004 from Dr. George Gales shows your physical impairment as class 5; which is incapable of minimum activity. He indicates you cannot sit more than 20 minutes.

On October 10, 2003, you were cleared physically by Dr. Antonelli, your cardiologist.

1

We also requested information from Dr. Gales. On September 14, 2004 he states you remain permanently disabled due to a combination of disorders. He indicates you injured your left wrist in 1969 and your right wrist in 1996, with resultant wrist deformities and limitation of motion. He further states, "he attempted to return to work for "light duty" on October 18, 1999, but in 2001 he suffered a heart attack and underwent angioplasty and coronary stent placement. He developed a right femoral nerve injury as a complication of the cardiac catheterization, resulting in pain an numbness in his right thigh." Dr. Gales indicates you continue to experience chest pains and shortness of breath, triggered by emotional stress, related to your heart disease."

On September 20, 2004 we received a note from Dr. Antonelli. She indicates that you continue to have frequent angina, exacerbated by stress and emotional upset. She also states you have chronic disabling pain of your leg and these conditions are expected to be permanent.

On October 8, 2004 your file was sent to Dr. Philip Jordan Marion and Dr. Michael Rosenberg for a peer review.

Dr. Marion spoke to Dr. Gales on October 21, 2004. Dr. Gales indicated you have complaints of depression and anxiety, which causes chest pain when you are in a stressful situation. He states, "there were no significant objective neurological or musculoskeletal deficits that would preclude him from performing his routine sedentary or light duty activities at work." However, Dr. Gales stated that you were totally disabled secondary to you underlying psychiatric and cardiac diagnoses. Again, Dr. Gales indicated that there were no objective neurological or musculoskeletal deficits that would have precluded you from performing sedentary or light duty physical demand work. We then asked that Dr. Marion answer some specific questions regarding your claim.

1. From a physical and pain management perspective, based on the available medical documentation, what is the correct diagnosis related to claimant's right leg pain?

Mr. Toscano's clinical presentation is consistent with a diagnosis of right lateral femoral cutaneous neuropathy consistent with a diagnosis of meralgia paresthetica. He had a documented normal electrodiagnostic evaluation. However, this diagnosis is a purely sensory presentation and should not have any significant motor strength component.

2. From a physical and pain management perspective, as of October 20, 2004, what are reasonable restrictions and limitations for this claimant?

From a physical medicine and pain management perspective, there are no particular restrictions or limitations for Mr. Toscano. There are no significant neurological or functional deficits noted in the clinical record. In addition, there have been no noted cognitive deficits that also might affect his functional capability.

3. Based on the medical documentation, does the claimant have an impairment, which prevents him from performing sedentary work as of October 20, 2004?

Based on the medical documentation, Mr. Toscano does not have an objective impairment that would prevent him from performing sedentary work as of October 20, 2004. There are no objective neurological deficits, significant radiological pathology, or electrodiagnostic deficits that would preclude him from performing the routine duties of a sedentary job as of October 20, 2004.

4. Based on the medical documentation, does claimant have impairment, which prevents him from performing light physical demand work as of October 20, 2004? Please explain.

As noted in the above question, based on the medical documentation, Mr. Toscano does not have impairments that would prevent him from performing light physical demand work as of October 20, 2004. There are no objective neurological deficits, radiological pathology, or electrodiagnostic deficits that would preclude him from performing light physical demand work as of October 20, 2004.

Dr. Rosenberg states, "Mr. Toscano has no cardiovascular impairment on the basis of objective findings. The two recent exercise tests, in 2003, and 2004, both demonstrate functional class 1 activity, limited by fatigue and by difficulty with his meralgia related to the right leg. There are no findings of left ventricular dysfunction or heart failure, and no rhythm disturbances or syncope. Thus, there is no cardiovascular limitation supported on the basis of the records provided." He further states, "Mr Toscano has no cardiovascular limitations of function on the basis of the information provided. Stress appears to play a commanding role in Mr. Toscano. Psychiatric impairment, however, is beyond the scope of this examiner's expertise. From a cardiovascular perspective, however, there are no limitations of function. There are no safety restrictions to be placed upon Mr. Toscano due to his cardiovascular disease." Dr. Rosenberg tried to make phone contact with Dr. Antonelli on October 15, 2004, October 18, 2004, October 26, 2004, and again October 28, 2004. At the time of preparation of this report, a return call was not received.

We then asked that Dr. Rosenberg to answer some specific questions regarding your claim.

1. Based on the available medical documentation from a cardiovascular perspective as of October 20, 2004, what are reasonable restrictions and limitations?

There are no reasonable cardiovascular limitations or restrictions to be placed upon Mr. Toscano. His exercise test demonstrates him to be functional class 1 limited by fatigue and leg paresthias. He demonstrates no evidence of myocardial ischemia and no evidence of left ventricular dysfunction or rhythm disturbance.

2. Please explain the claimant's impairment and the medical basis for that impairment?

Mr. Toscano has a history of coronary artery disease, treated with stent implantation in the mid left anterior descending. There is a statement in the record relating to previous myocardial infarction, but there is no evidence thereof on the perfusion images or electrocardiograms. No records are provided supporting that. Thus, there is no cardiovascular impairment.

3. Based on the medical documentation, does the claimant have impairment, which precludes his performing sedentary work as of October 20, 2004?

Mr. Toscano has no cardiovascular impairment, and would be capable of performing sedentary work as of October 20, 2004.

4. Based on the medical documentation, does the claimant have impairment, which would preclude him from performing light physical demand work as of October 20, 2004?

Mr. Toscano has no cardiovascular limitations that would preclude him from performing light physical demand work as of October 20, 2004.

On November 5, 2004, Dr. Antonelli returned Dr. Rosenberg's call. When asked about your cardiovascular status, Dr. Antonelli response was, "He is disabled more from an anxiety perspective. He continues to have chest pain, but it is more from anxiety and somatization than from CAD. He has had normal stress tests and…you know." So in summary from Dr. Rosenberg, the teleconference information has not altered his previous opinion.

On November 10, 2004 we received forms completed by Dr. Andrey Gagarin. Dr. Gagarin indicated you have significant restrictions to sustain work performance, attention span and cope with work pressures.

On November 11, 2004 we received forms completed by Laurie Sherwood, LICSW. She indicated you have significant restrictions to sustain work performance, attention span and cope with work pressures.

On December 30, 2004 your file was referred to Dr. Andrew Brown, M.D. consulting psychiatrist for review. On January 11, 2005, he stated, "The presence of anxiety and deconditioning in the insured is directly attributable to his prolonged separation from the workplace. Optimal occupations and jobs for the insured would include those positions which do not initially expose the insured to undue amounts of time pressure or an excessive degree of responsibility. Initial expectations of the insured at the workplace would ideally entail that he complete relatively routine and concrete tasks. It would be especially important to avoid exposing the insured to any ambiguity with regard to a) precisely what is expected of him, and b) the particular tasks which he is expected to accomplish .While formal restrictions and limitations are not indicated in this case, given the insured's prolonged separation from the workplace he may choose to work part time for a discrete period of time prior to transitioning to full time employment. Similarly, discussions about job fit for the insured should be informed by an awareness of the insured's particular sensitivities and talents."

In addition, we asked that our consulting physician contact your physician. Dr. Brown spoke to Dr. Gagarin on January 11, 2005. The following are excerpts from their conversation.

"We discussed the insured's deconditioning in the context of his prolonged separation from the workplace, the types of work activity which the insured would be best suited for, and

4

those types of demands which you felt would not be appropriate for the insured. While you emphasized a) the insured's motivation to return to work, b) the fact that he manifested intact intellectual ability, and c) the benefits which would be expected to be derived from a return to work (i.e., daily structure, stable income, restoration of self esteem), you also characterized the insured as a highly anxious individual who had certain sensitivities which needed to be acknowledged. You felt that the insured would do best in an atmosphere in which he was not expected to assume an excessive amount of responsibility. You did not feel that the insured could be perform if exposed to undue amounts of time pressure. We agreed that the insured would be expected to have a difficult time tolerating any type of criticism, and that the insured would therefore be best suited for a job in which he was unlikely to experience excessive performance demands.

We moved on to a discussion of specific occupations, which might be appropriate for the insured. I referred to a transferable skills analysis which I had reviewed (but which I did not have in front of me) and recalled that the occupation of office clerk was among those listed. We agreed that placement in such a job would be feasible for the insured, assuming that the insured's particular job did not involve the pressures referred to in the previous paragraph. You reiterated that the insured was motivated to work and that he manifested an intact intellectual ability. (For your information, Dr. Gagarin, since I spoke with you I re-reviewed the transferable skills analysis and was reminded of the other occupations listed. They include: Translator, English as a Second Language Instructor, and Customer Service Representative).

You indicated that the insured would do best if he was allowed to transition back to work. You feel that the insured should work part time initially, and then eventually return to full time work. We discussed the potential relevance of vocational rehabilitation services for the insured. I indicated that while I was not aware of whether Mr. Toscano's disability insurance contract/policy allowed for the provision of such services, that I could inquire about the availability of such services if you felt that Mr. Toscano could benefit from the offering of such services. You felt that the insured would be receptive to the offering of such services, and that he would avail himself of supportive services aimed at assisting him in his return to work.

In closing, we agreed that the insured's separation from the workplace had been unnecessarily prolonged and that the insured would be best served by a return to work. We discussed the unfortunate circumstances surrounding his termination from Fleet Bank and the insured's experience of this termination as unjust.

Your file was referred to a Vocational Specialist to conduct a vocational analysis of your current capabilities, training, education and experience. The results show your transferable skills include:

- Skilled in teaching, speaking and writing Italian in correlation with the English language. Ability to write effectively and clearly communicate and summarize documents and ideas.
- Communicating effectively verbally and in writing.
- Ability to utilize computer in business environment.
- Ability to give and follow written and verbal instructions.

5

- Ability to record information accurately.
- Ability to complete a variety of tasks and respond to change.
- Can use logic and reasoning to identify the strengths and weaknesses or alternative solutions, conclusions or approaches to problems.
- Documents and assesses information through entering, transcribing, recording, storing, and maintaining information in written or electronic form.
- Skilled in ability to influence, motivate, and train others with patience and creativity.

Based on this information you have the ability to perform the following occupations:
- Customer Service Representative
- Translator/Interpreter
- Office Clerk
- ESL Teacher

On January 12, 2005 our vocational counselor called you to offer vocational services to assist you with re-entry into the work force. You stated you were disabled for life due to your heart, emotional states and injured vein in your leg. Therefore, refusing our offer of vocational rehabilitation services, the vocational counselor has closed your file.

We have determined that you could perform with reasonable continuity the material and substantial duties of these occupations based on your capacity and skill level.

Therefore you do not meet FleetBoston Financial Corp definition of disability beyond October 20, 2004 and we must deny your claim for further benefit consideration, and your claim is closed as of January 19, 2005.

This claim determination reflects an evaluation of the claim facts and policy provisions.

Under the Employee Retirement Income Security Act (ERISA), you may request a review of this denial by writing to:

>  The Liberty Life Assurance Company of Boston
>  Attn: Kelli Triano
>  P.O. Box 1525
>  Dover, NH 03821-1525

You may also request to receive, free of charge, copies of all documents relevant to your claim. The written request for review must be sent within 180 days of your receipt of this letter and state the reasons why you feel your claim should not have been denied. If Liberty does not receive your written request for review within 180 days of your receipt of this notice, our claim decision will be final, and no further review of your claim will be conducted. In your request for review you should include all documentation, such as test results, consultations, claim specific information, which you feel will support your claim, as you will be afforded one opportunity for review.

Under normal circumstances, you will be notified of the final decision within 45 days of the date that your request for review is received.

If there are special circumstances requiring delay, you will be notified of the final decision within 90 days after your request for review is received. Additional time for final decision may exceed 90 days to the extent that the timeframe is tolled while Liberty is awaiting receipt of requested documentation needed to fully evaluate your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

If you have any questions about this determination please call me.

Sincerely,

Kelli Triano
Sr. Disability Case Manager
1-800-210-0268 Ext. 38926
fax (603) 743-6422

GEORGE F. GALES, JR., M.D.
953 HANCOCK STREET
QUINCY, MASSACHUSETTS 02170

TELEPHONE: 617-472-4212

To Whom It May Concern:                         February 10, 2005
Re: Filippo Toscano

Mr. Toscano is disabled due to a combination of deficits.

Orthopedic limitations: Mr. Toscano is disabled partly by injuries to his wrists. He first injured his left wrist in 1969 when it was fractured and treated non-surgically. He also suffered a fracture of his right wrist that occurred at work in 1996. He has deformities and limitations of motion of both wrists.
His current restrictions include:
    lifting up to 5 pounds occasionally
    no rotation of the right wrist
    no repetitive grasping
    he cannot sit for more than 30 minutes at a time
He has been evaluated by orthopedic surgeons in the past, and it is not felt that surgery would be of benefit.

Cardiac Limitations: Mr. Toscano suffered a heart attack in September of 2001. he underwent angioplasty and coronary stent placement at that time. When he had the cardiac catheterization, it was complicated by an injury to his right femoral nerve. The nerve injury is manifested by pains and numbness of his right anterior and lateral thigh, (meralgia paresthetica). The pains are worsened by prolonged sitting or standing, bending, or climbing.
His cardiac symptoms include chest pains, dyspnea, and fatigue. These symptoms are triggered by emotional stress and also by ordinary amounts of exertion. He is NYHA functional class II. His medications include lovastatin, atenolol, hydrochlorothiazide, nitroglycerine, and aspirin.
He underwent an exercise myoview stress test on April 23, 2004 which was limited in that he only achieved 60% of his predicted maximum heart rate. This study showed a normal ejection fraction of 61% with no areas of ischemic reperfusion. He had no symptoms of chest pain or EKG changes during the test.

Emotional limitations: He has anxiety which is worsened by stress of any sort. He takes Lexapro, an anti-depressant, which has helped somewhat. When he becomes upset, it triggers symptoms of chest pains. He cannot perform any work that is stressful.

Prognosis: I do not expect any improvement in Mr. Toscano's functional capacity given the duration and severity of his multiple conditions.

Respectfully,

*[signature: George F. Gales Jr]*

**LISA ANTONELLI, M.D., F.A.C.C.**
CARDIOLOGY AND INTERNAL MEDICINE

mailed 2/4/05

500 CONGRESS STREET
SUITE 2F
QUINCY, MA 02169
PHONE: 617-472-2270
FAX:   617-773-2193

January 31, 2005

Ms. Kelli Triano
Senior Disability Case Manager
Liberty Life Assurance Company
Of Boston, Disability Claims
P. O. Box 1525
Dover, NH  03821-1525

**RE:  Filippo Toscano**
**CLAIM#:  744036**

Dear Ms. Triano:

This letter is in follow up to your disability determination on Mr. Toscano. He has asked me to provide further information to you.

As stated in your letter to Mr. Toscano, dated January 20, 2005, I did discuss Mr. Toscano's case with Dr. Rosenberg. Mr. Toscano does have a history of angina and neuropathy related to his cardiac catheterization and angioplasty done in 2001. He continues to have frequent disabling chest pain, brought on by emotional distress, and shortness of breath with mild exertion. His most recent stress test on 2/10/04 was negative for chest pain and EKG changes, his stress test was normal. Therefore, it is unlikely that he has significant epicardial coronary disease. The patient may have microvascular disease or coronary artery spasm as a cause of his symptoms.

I just want to reiterate that Mr. Toscano's symptoms are frequent, severe, and in my mind, disabling.

Sincerely,

Lisa P. Antonelli, M.D.
LFA/tp/dab

Laurie Sherwood, LICSW<br>
23 Pleasant Street<br>
Newton Centre, MA 02459<br>
(781)-559-8206

Liberty Mutual Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525

To Whom It May Concern,

    It is my understanding that, with no exception, Filippo Toscano's caregivers have indicated that he is unable to return to work related to his physical disabilities and associated emotional handicaps. I find it disturbing to hear that he is being denied benefits and would sincerely appreciate an explanation that clarifies your thinking about this.

    It is clear that the hardship of his disability is significantly and negatively compounded by the ramifications of your decision. It is not at all clear to me how this decision was determined, nor is it for Mr. Toscano. On his behalf, I would advocate that further consideration be given to his status and eligibility for disability benefits.

    Should you need to contact me, feel free to reach me at the above phone number.

Sincerely,

*[signature]*

Laurie Sherwood, LICSW

**Nova Psychiatric Services**
Suite 31
1261 Furnace Brook Parkway
Quincy, MA. 02169
(617) 479-4545

Re: Filippo Toscano

From: Andrey Gagarin MD

The pt. is unable to work in conditions that he is now. He has significant deterioration of his health after denied his disability. I would like Mr Toscano to work, but it is not realistic. I do not think that denial of disability is a right decision.

1.31.05

/Andrey Gagarin M.D./



**Liberty Mutual**

Liberty Life Assurance Company of Boston

Group Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
800-210-0268

January 11, 2005

Andrey Gagarin, M.
Nova Psychiatric Se
1261 Furnace Brook
Suite 31
Quincy, MA  02169

Re:  Filippo Toscano
     Claim # 744036

Dear Dr. Gagarin:

Thank you for taking the time to speak with me. Liberty Life Assurance Company is the disability insurer for your patient, Filippo Toscano. I called to discuss your patient's recent and current clinical status.

During our discussion you described the insured's anxiety, and the extent to which this anxiety was relatively refractory to treatment with psychotropic medications. At present, you see the insured every one to two months. You noted that you had encouraged the insured to undertake increased activity, including increased physical activity, but you noted that during the insured's prolonged separation from the workplace he had become increasingly fearful. The insured would also refer to his cardiac condition in this context. We agreed that the insured's mental health would have been best served by an expeditious return to work immediately following his job loss at Fleet Bank, the degree to which the insured would have been psychiatrically capable of such a return, and the fact that the insured has not benefited from the lack of structure associated with his prolonged separation from the workplace.

I asked you about the insured's motivation to work. You referred to the insured's integrity and noted that he was indeed motivated to work. You indicated that the insured had in fact been looking for work quite recently. You noted that you could not recall precisely when this occurred, but you estimated that it was perhaps six months ago. Your impression was that the insured was very particular with regard to his choice of job and that this interfered with his ability to find a job. You referred to the insured's obsessional anxiety in this context. You described the insured as very interested, and as very responsible. I asked you about the insured's lawsuit against Fleet Bank, and wondered whether the insured's focus on this case militated against an interest in returning to work. You indicated that the insured focuses on his case because he "has nothing else", and that this focus would be expected to diminish if the insured found a job.

We discussed the insured's deconditioning in the context of his prolonged separation from the workplace, the types of work activity which the insured would be best suited for, and those types of demands which you felt would not be appropriate for the insured. While you emphasized a) the insured's motivation to return to work, b) the fact that he manifested intact intellectual ability, and c) the benefits which would be expected to be derived from a return to work (i.e., daily structure, stable income, restoration of self esteem), you also characterized the insured as a highly anxious individual who had certain sensitivities which needed to be acknowledged. You felt that the insured would do best in an atmosphere in which he was not expected to assume an excessive amount of responsibility. You did not feel that the insured could be perform if exposed to undue amounts of time pressure. We agreed that the insured would be expected to have a difficult time tolerating any type of criticism, and that the insured would therefore be best suited for a job in which he was unlikely to experience excessive performance demands.

We moved on to a discussion of specific occupations which might be appropriate for the insured. I referred to a transferable skills analysis which I had reviewed (but which I did not have in front of me) and recalled

*[handwritten: No Signed Comments]*

that the occupation of office clerk was among those listed. We agreed that placement in such a job would be feasible for the insured, assuming that the insured's particular job did not involve the pressures referred to in the previous paragraph. You reiterated that the insured was motivated to work and that he manifested an intact intellectual ability. (For your information, Dr. Gagarin, since I spoke with you I re-reviewed the transferable skills analysis and was reminded of the other occupations listed. They include: Translator, English as a Second Language Instructor, and Customer Service Representative).

You indicated that the insured would do best if he was allowed to transition back to work. You feel that the insured should work part time initially, and then eventually return to full time work. We discussed the potential relevance of vocational rehabilitation services for the insured. I indicated that while I was not aware of whether Mr. Toscano's disability insurance contract/policy allowed for the provision of such services, that I could inquire about the availability of such services if you felt that Mr. Toscano could benefit from the offering of such services. You felt that the insured would be receptive to the offering of such services, and that he would avail himself of supportive services aimed at assisting him in his return to work.

In closing, we agreed that the insured's separation from the workplace had been unnecessarily prolonged and that the insured would be best served by a return to work. We discussed the unfortunate circumstances surrounding his termination from Fleet Bank and the insured's experience of this termination as unjust.

If you agree with the above representation of our telephone call, please sign and date a copy of this letter and return it to me either facsimile (603-743-3123) or mail. Please make any corrections or additions in the margins as you deem appropriate. Liberty Life Assurance Company is willing to reimburse any reasonable costs incurred in responding to requests.

Thank you for your time and attention in this matter.

Sincerely,

*[signature: Andrew O. Brown MD]*

Andrew O. Brown, M.D.
Consulting Psychiatrist

Cc: Kelli Triano

*1.31.05*

*[Handwritten note:]* I do not agree to a possibility to return to work. I think Mr Toscano can use some volunteer job, but he can not tolerate any permanent responsibility now. Attempts to aquire permanent (part time included) responsibility could deteriorate the pt's health. Job training would be desirable, but to a possibility that Mr. Toscano will never come back to work. Sincerely, *[signature]* Andrey Gagarin, MD